THE STATE OF IOWA v. MARION JONES, Appellant.

**Assault with intent to murder:** EVIDENCE. In a prosecution of a son-in-law for an assault with intent to murder his father-in-law, a conversation between the defendant and his wife, not tending to disclose a menace or threat of violence on the father-in-law's part is inadmissible.

**Same.** Inquiry of a witness as to whether he was on good terms with the relatives of the accused, was immaterial.

**Evidence:** IMPEACHMENT. Where a witness testified that he did not remember what statements he had made concerning his testimony before the grand jury, refusal to allow him to answer whether he had stated that he had said nothing against the defendant, was not error.

**Exclusion of evidence.** Refusal to permit a witness to answer certain questions concerning a conversation with defendant, though proper but not tending to aid the jury in determining the vital issues, was not prejudicial error.

**Instruction:** SELF DEFENSE: ERRONEOUS USE OF WORDS. In instructions defining the peril which will justify a killing in self defense, the use of the word "eminent" in the place of "imminent" is held to have been without prejudice, over the objection that as used it was meaningless, and as the instructions as a whole indicated the sense in which its use was intended it was not misleading.

**Instructions:** SELF DEFENSE. Where there is no evidence in a prosecution for assault with intent to murder, that after provoking the assault the accused had changed his purpose and sought to avoid the conflict, an instruction that if defendant provoked the assault his plea of self defense was of no avail, was correct.

*Appeal from Mahaska District Court.*— HON. W. G. CLEMENTS, Judge.

\*THURSDAY, OCTOBER 27, 1904.

THE defendant was accused of assault with intent to commit murder, and was convicted of assault with intent to commit manslaughter. He appeals.— *Affirmed.*

*James A. Carroll* and *Geo. W. Laferty,* for appellant.

*Chas. W. Mullan,* Attorney General, and *Lawrence De Graff,* Assistant Attorney General, for the State.

LADD, J.— The accused, with his wife, to whom he had been married but a few weeks, was visiting at the home of her father, George Gobel. He and Gobel had been hunting together, and the witnesses agree that prior to Monday,

_____

*This is the modified opinion.    The original opinion was filed April 13, 1904.

October 9, 1902, their relations had been entirely amicable. The night previous defendant had passed at his brother's home. In going to Gobel's house in the morning he had carried his gun, as he says, to hunt on the way. After talking with his wife a short time, they walked up the road, and finally sat down at one side. Gobel had been working the highway in front of his house, and, according to his testimony, first noticed defendant part from his wife at the edge of some brush, enter therein, and soon emerge with his gun, and come toward Gobel near the house, where he demanded his wife, who was near Gobel, to which the latter responded· that he must put his gun up first, whereupon defendant fired, the shot striking in the back of Gobel's neck and head as he dodged around the corner of the house. Gobel fell, but immediately arose, and entered the house, where he procured a revolver, and returned to the door. It would not work, but while trying it he was shot again by defendant, and as a result lost his right eye. On the other hand, the defendant claims that he had left his gun near the house; that, as Gobel approached the place where he and his wife were sitting, defendant withdrew, and, to avoid Gobel, went in a round about way for his gun; that when he reached it Gobel was inquiring for him, and as soon as they met admonished him with epithets that he might as well conclude to die right there, and rushed toward him with revolver in hand; that, as defendant's wife protested, Gobel conducted her into the house, and defendant loaded his gun and stepped off; that Gobel snapped his revolver at defendant, but it did not go, and the latter then backed away, when both fired. Enough of the details are given to indicate that the question of the accused's guilt was solely for the jury, and to render intelligible other points decided.

II. The defendant was a witness in his own behalf, and was asked numerous questions concerning what he and his wife were talking about when at the roadside, why she was crying, and what she had said that caused him to avoid.

Gobel. Objections to all of these were properly sustained. It could not be inferred from any of the inquiries that the answers sought would disclose a menace or any threatened violence on Gobel's part, and, if not, what was said could have had no bearing on the issues being tried. Even though, as intimated in one question, Gobel's wife was determined to separate defendant from his wife, and had induced him to feel the same way, this would not afford ground to apprehend danger to life or limb. The accused did testify that nothing of an unpleasant character had occurred between himself and wife, and that because of what she had said he tried to avoid Gobel. This explained how he came to approach the house as he did, and was all he was entitled to show.

1. EVIDENCE.

Inquiries were also made as to whether since the trouble they (presumably his wife's parents) had allowed him an opportunity to see or converse with his wife. This called for a mere conclusion, which was not admissible. The fact, if it be such, that they had sent her to Des Moines, or elsewhere, does not appear to have had the slightest bearing on the issues being tried.

III. On cross-examination inquiry was made of Gobel whether he was on good terms with defendant's brothers and family. Such evidence was immaterial for any purpose. The inquiry as to how he came to send defendant's wife to Des Moines after the shooting was not proper cross-examination.

2. SAME.

IV. David Boyd testified that shortly after the shooting defendant declared that it was his intention to kill the whole Gobel family or get his wife. To lay the foundation for impeachment, he was asked on cross-examination whether he had not said to his son Albert, in substance, that he had testified to nothing against the defendant before the grand jury. To this an objection was sustained. The witness might well have been allowed to answer, but, as he distinctly asserted at least

3. EVIDENCE: impeachment.

twice that he did not remember what was said to his son, the ruling was without prejudice.

V.   One Flewelling testified in rebuttal that in an interview of defendant while in the county jail defendant stated that he had fired one shot accidentally, when Gobel fell, and the other two were fired at once, both 4. EXCLUSION OF triggers being pulled at the same time.   On EVIDENCE. cross-examination he was asked: "Did Marion tell you there that Gobel did not shoot at all?"   "Did he tell you where these shots struck?"   Answers might well have been permitted, as to hold that the questions did not relate to the same subject-matter would seem altogether too technical.   But the ruling was entirely without prejudice, as the most favorable answer either inquiry suggests would not have aided the jury in passing upon the vital issues of the case.

VI.   In the seventeenth, nineteenth, and twentieth instructions, stating the rules of self-defense, the word "eminent" was made use of, instead of "imminent," in defining 3. INSTRUCTION: the peril which would justify what was done. self defense; Appellant insists that "eminent," in the con- erroneous use of words. nection employed, was meaningless.   If so, the mistake could have worked no prejudice to him, for in that event any peril, if sufficient, whether imminent or otherwise, was declared enough to make out the defense.   If, however, the word be accorded its usual meaning, as important, high, or lofty, it is to be said that the peril of defendant, if any, must have been great, as Gobel, according to the evidence tending to sustain the plea of self-defense, was at all times armed with a deadly weapon.   That the jury could not have been misled fully appears from a portion of the seventeenth instruction, containing the objectionable word:

To justify the defendant, however, in resisting in self-defense, he is authorized to use such force as may be necessary, or appear to him, as a reasonably careful, prudent, and cautious man, to be necessary, to protect himself from injury.

The extent to which he may go is to be measured by the character of the assault made upon him, if any, or may appear to him as a reasonably careful and prudent man. While the danger must be *eminent* and perilous, yet it is not necessary that the danger should be actual. But it must appear to him, as a reasonably prudent and cautious man, to be actual, although he may be mistaken as to the extent of the actual danger. But, to make an assault with a dangerous and deadly weapon justifiable by the defendant, the danger must have been actual and urgent, or appear to him, a reasonably careful and cautious man, to have been actual and urgent.

This indicated to the jury the sense in which the word was intended; that is, the danger must have appeared to be actual and urgent. So, in the other instructions, it was made clear to the jury that all that was essential to exculpate defendant was that he, acting as a man of ordinary prudence would act in like circumstances, believed that Gobel was about to assail him with a deadly weapon, and what he did seemed necessary to protect his life or to avoid great bodily harm.

VII. In the twentieth instruction the law was applied to the particular facts which the evidence tended to establish, closing with this language: " If you find from the evidence that the defendant invited or provoked an assault to be made upon himself by George Gobel, then the defendant's plea of self-defense will be of no avail. No mere words, however insulting, will justify an assault." This is assailed in that it excludes the law with respect to change of purpose. See *State v. Dillon.* 74 Iowa, 653. But there was no evidence upon which a conclusion that defendant, if he made the assault, ever changed his purpose. If his account be accepted, Gobel was the assailant, and the instruction had no application. Nothing in the record indicates a change of purpose after the first encounter. If thereafter the accused backed away, it was to load his gun, which he refused to surrender when

6. INSTRUCTIONS: self defense.

demanded by his brother. Had there been any change of purpose, he could easily have avoided Gobel after the latter entered the house. Instead, according to his own story, he was meeting force with force, without apparent thought of evading the issue. The instruction was correct then in omitting reference to a question not raised by the evidence.

The exceptions to other instructions are without merit. The charge, when considered in its entirety, is a clear exposition of the law applicable to the case. We discover no reversible error, and the judgment must be *affirmed*.